PIETRO CARDARELLI *vs.* PROVIDENCE JOURNAL COMPANY.

JULY 11, 1911.

PRESENT: Dubois, C.J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ.

(1) *Libel. Plea of Truth.*

In an action for libel in which the truth of the publication complained of was pleaded, upon conflicting testimony, it not being clear that defendant has sustained the burden of establishing the truth of the article published by it, a verdict for the plaintiff will not be disturbed.

*(2)   Libel.   Plea of Truth.   Burden of Proof.*

In an action for libel in which the truth of the publication complained of is pleaded, a prima facie case is made for the plaintiff by showing that the articles are libelous and that they were published by defendant, and upon the issue of truth, even if the evidence for the respective parties was equally balanced and equally discredited, the plaintiff must prevail, for the reason that defendant has failed to establish by a preponderance of the evidence the truth of the publication.

*(3)   Libel.   Punitive Damages.*

In an action for libel instruction to the jury that if they decided that plaintiff was entitled to punitive damages, in that case the amount was entirely in their discretion up to the ad damnum of the writ, was proper.

*(4)   Libel.   Truth.   Malice.*

In an action for libel, instruction to the jury that if the defendant established by a fair preponderance of the evidence that the publication was true and was not actuated by malice, but was published in good faith, that it was not liable but that if it was true but was published from a malicious motive, it constituted no defence, was a correct exposition of the constitutional provision in this regard.

JOHNSON AND SWEETLAND, JJ. dissenting.

TRESPASS ON THE CASE for libel.   Heard on exceptions of defendant and overruled.

BLODGETT, J.   After verdict for the plaintiff in this action of libel, in which the truth of the publication complained of as libelous was pleaded by the defendant, the cause is brought here on defendant's exceptions to the denial of a new trial by the Superior Court and also because of alleged error in the admission and rejection of testimony and in the instructions and refusals to instruct the jury by the trial justice.

The articles complained of were published in the Providence Daily Journal, April 19, 1909, and the Evening Bulletin of the same date and in the same papers on April 26, 1909, and are set forth in the declaration as follows:

"Constable Peter Cardarelli offers newspaper man protection, believing him Poker Sharp planning to open joint." "Says he already has one unlicensed saloon on his list." "This Constable, Peter Cardarelli, thought he was talking to a poker sharp, who was planning to start a 'joint' in Centredale." "Not only did he offer to assure protection

for a financial consideration, but he also wanted the gambling place on his own land in a shack he would build for the purpose." "Cardarelli declared that he already had one client of this sort on his list—the proprietor of an unlicensed drinking place up Waterman Avenue." "Cardarelli, who is known as Pete by all the inhabitants of North Providence, happened to get the impression when he was talking to the newspaper man that his interviewer was a poker sharp who wanted to open up a gambling joint in Centredale."

"The obliging constable promised the supposed gambler that he would give him full police protection if he should open a place on his beat. By way of proof that he could furnish such protection, he named a place under his protection that was selling beer without a license."

"I will tip you off."

"Cardarelli was especially anxious that the supposed gambler should not make any attempt to get protection through Chief Willis."

"I will know the moment a raid is planned and I will tip you off he said. Willis once got after this beer place that I'm protecting and I simply went up there and tipped them off. I'll do the same for you. The newspaper man approached Cardarelli first on Saturday night. At that time the Constable was standing in front of the Centredale Hotel. Within the Hotel, musicians were playing a lively tune and shouts could be heard for half a block. Cardarelli said he would interfere in a minute if he dared. He said he couldn't even make an attempt to stop Sunday selling, for if he did, his head would be cut off. When asked about the chances for opening a poker room, where some big players from Providence could get into a lively Sunday game without any possibility of interference, Cardarelli thought for a minute, and then said he knew of a plan that would just suit. He explained that he owned some 30 acres of woodland about a quarter of a mile back from Waterman Avenue, near Sawin Avenue and that he could build a shack on it and let the poker players use it. If any questions were

asked, he said he could tell the people that he was going to put his engine in the shed."

"Price Wouldn't Be High."

"He said he could furnish complete protection, and that his price wouldn't be so high that he could get rich in a minute."

"Cardarelli confided to the newspaper man that he was practically certain of being elected Chief of Police at the next election, and that even better protection could be given after that."

"At the conclusion of the conversation he told the reporter, confidentially, that the reason why he wanted to close up the saloons which were running in Centredale on Sundays was because the saloon keepers had tried to make him lose his job."

"Cardarelli repeated all these statements yesterday in the presence of another witness."

"The reporter then went to Centredale to see if conditions had improved since last Sunday, when Constable Peter Cardarelli watched the operations, and told the reporter that such a condition was allowed because some one was getting his 'rake off.'

"Constable Charles H. Brown is a new man, appointed to take the place of Constable Cardarelli, who last week offered to give protection to the Journal man, thinking him a poker sharp preparing to open a poker joint."

The declaration also avers that at each of the times complained of the plaintiff was a duly elected and commissioned constable of said town of North Providence and was in the receipt of an income also as a paid member of the police force of said town for services as an officer on Saturday nights and Sundays in said town, and that by reason of said publications he has not only been greatly damaged in his reputation, but has lost these positions and offices thereby and the income resulting therefrom.

The evidence for the defence is to the effect that the plaintiff made the statements and offer complained of to

one of the defendant's reporters, while the plaintiff denies that any such interview ever occurred or that he ever saw or knew the reporter until the latter appeared as a witness against the plaintiff at a hearing before the town council of said town on May 3, 1909, called for the purpose of investigating these charges against the plaintiff.

(1)    In his decision denying the motion for a new trial, the trial justice says: "An irreconcilable mass of conflicting testimony is presented. The jury found for the plaintiff. The burden of establishing the truth of the publications is upon the defendant. It is by no means clear that the defendant has answered the requirement of the law in this respect. The Court cannot say, as a matter of law, that the jury was not warranted in returning a verdict for the plaintiff."

We are compelled to the same conclusion. It is evident that both accounts cannot be correct.

The verdict in this case is not difficult to understand inasmuch as an examination of the testimony given by the defendant's reporter Underhill upon his direct examination at the trial shows many admitted falsehoods told by him to the plaintiff and others, by this term meaning statements admittedly known to be untrue and which were made with intent to deceive the plaintiff and others, viz.: (p. 258) "Q. Where are you employed? A. Providence Journal. Q. How long have you been employed on the Providence Journal? A. Since the 15th of June, 1908. Q. In what capacity? A. A reporter. Q. What particular line of reporting do you do? A. At present I have charge of the Department of State Politics." (p: 264) "Then so as to throw him off the track as to my real identity I told him that I was a poker player. I said, 'Do you—is there any gambling out here?' He said, 'Oh, there is a little, not very much. Once in a while I see the boys having a game.' I think he said near the police station but he said there was none out there to speak of. I said, 'That is my line. I am a poker player.' And I told him that the

Providence Journal had been conducting so vigorous a campaign against gambling and gamblers in the city that we fellows in the city had been compelled to shut up and get out and I told him I had come out there for the purpose of looking the ground over to see if perhaps I couldn't find some place where I could start up a little game out there. Told him it was convenient to the city because of the trolley lines and it seemed to be in a somewhat out of the way place. This conversation took some time, a good deal more time than I have taken to tell it. And I asked him if he knew of a place where I could start up such a game. I had in mind—oh, some room over a store or something of that sort. And he promptly replied that he knew of just the sort of a place that I was looking for. He said he had a good place where we could run a Sunday game. Well, I had had no thought of a Sunday game but seeing he began to take the way I wanted him to take I took the new lay he gave me and began to talk of a Sunday game." (p. 266) "Q. Was anything said by you about your having a partner? A. Yes, I told him I had a partner and I told him I furnished the money to run the game, that my partner was the practical man of the two. I told him I would have to talk the matter over with him but I thought the proposition looked very favorable, that we would come out—Oh, I asked him where I could see him the next afternoon," (p. 275) "Q. By the way, do you play poker? A. I do not. Q. Do you know how to play poker? A. I do not." (p. 278) "Q. What did you endeavor to ascertain from McCormack? A. I asked him if Mr. Cardarelli was on that beat that afternoon. He told me no, he had been transferred to Woodville. I asked him if Cardarelli had some woodland and told him I was interested in buying some woodland and that Cardarelli had some." (p. 279) "Q. Now tell us what conversation you had with him that afternoon. A. I introduced my brother to him as Mr. Stanley. I said, 'This is my brother, Mr. Stanley.' I said, 'I hadn't told you my name before but my name is Stanley. His name is Walter

Stanley and mine is Edward Stanley.' I said, 'My partner was unable to come this afternoon and my brother happened to be in the city on business. I thought I would bring him out with me.' Q. What talk did you have with him about these matters that you discussed with him the night before? A. I told him my purpose in coming out was to find out how much it would cost us to run this poker place that we talked about up in his woods. He said, 'Well, I will tell you, I want to be frank with you and I feel that I ought to tell you at the start if you build that shack you will have to pay for it.' I said, 'Well, how much will it cost?' He said, 'Well, it ought not to cost much more than twenty-five dollars.' I said, 'Do you think you can build it for from fifty to one hundred, not more than one hundred?' He said, 'Yes, without any question.' I said, 'Well, then, if you can build it for that and we come to an agreement I will want you to build it and there wouldn't be any trouble about the money provided we can get it done for that amount.'" (p. 280) "Q. What was said, if anything, that afternoon about protection? A. I asked him—I told him that the big thing with us was to be sure that we wouldn't get arrested and he said if you had the right kind of men there was absolutely no question at all about that. He said he had this beer place he had protected for two years and was able to tip them off when there was going to be a raid and he said he was dead sure to be elected Town Sergeant or Chief of Police, I don't know which he called it, at the coming election and he said, 'When I am Chief then I will be able to give you even better protection than I can give you now.' I said, 'Well, how much is it going to cost us to get this protection?' He laughed and said, 'Well, it wouldn't be so much that I can get rich in a minute.'" (p. 281) "Q. 120. What was said that Sunday afternoon as to the kind of men that would frequent your place as to whether they would be the kind that would peach? A. He told me of course a good deal of our security from arrest would depend upon the kind of men who would come to

play the game.   He said if they were the sort of fellows that would keep their mouths shut and not give the thing away themselves there would be no trouble.   He said also, 'You know this will be up on my place and if you are caught I will be caught and I want you to have the right kind of men.'   I told him I had only big gamblers playing with me and there was no question at all about that."   On cross-examination he further testified as follows:   (p. 308) "Q.   Your special orders upon this day was to go out to get the lay of the liquor saloons in order to see whether or not there was any illegal liquor selling there the following day? A.   Also to find out the conditions there Saturday nights with regard to young girls and women coming out.   A.   But your principal object that night was to locate the rear doors, was it not, of the saloons?   A.   Oh, no.   I didn't go into the rear doors.   Just simply looked over the ground so I would know where the saloons were and know the location of things generally.   Q.   You were not directed to go out there and get conversation from Cardarelli in regard to gambling, were you?   A.   Absolutely not."   (p. 316) "Q.   And you say that you introduced Walter Stanley as the party that was with you but not as your partner?   A.   Yes. No, I told him my partner was unable to come.   My brother happened to be in the city."

It thus appears from the reporter's own testimony that he was instructed simply to obtain evidence as to the alleged illegal sale of liquor in that town and that he was not instructed or assigned to interview the plaintiff concerning the illegal protection of a gambling house.   He admits giving a false name and a false occupation and making the other false representations set forth in the above citations from his testimony.   There seems to be no question in the mind of the reporter that the course he thus pursued was entirely proper and commendable.   He does not urge in extenuation that his falsehoods were required of him by his superiors, but expressly avers that his instructions were (p. 304 Q. 256):   "I am expected to get the absolute truth,

nothing more and nothing less." He admits that he exceeded his instructions in his interviews with the plaintiff, concerning the protection of a gambling house referred to: he was not an officer of the law charged with the duty of detecting and punishing those who had violated the laws of the state prohibiting illegal gaming. And these false statements were made by him not to aid any officer of the law in obtaining evidence of any past violation of the laws of the state against illegal gaming, but, upon his own admission, were propositions on his part that both the plaintiff and himself should thereafter violate those laws, the plaintiff by knowingly letting to the reporter a "building or tenement" to be used for "illegal gaming" contrary to the provisions of Gen. Laws, 1909, cap. 108, sec. 5 and also to receive therefor as constable, money in violation of Gen. Laws, 1909, cap. 342, sec. 21 as follows: "Every sheriff, deputy-sheriff, town sergeant, city sergeant or constable, who shall receive from any defendant or any other person any money or other valuable thing as a consideration, reward or inducement for omitting or delaying to perform any duty pertaining to his office, shall be imprisoned not exceeding six months or be fined not exceeding five hundred dollars." By the provisions of Gen. Laws, 1909, cap. 123, sec. 17, it is made the "special duty" of all constables "to use their utmost efforts to repress and prevent crime by the suppression of all" . . . "gambling places." The reporter on his part proposed to keep and maintain the common nuisance of a "building, place or tenement" . . . "resorted to for illegal gaming," contrary to the provisions of Gen. Laws, 1909, cap. 108, sec. 3, and was to bribe an officer of the law to permit him to do so. Gen. Laws, 1909, cap. 350, sec. 2, is as follows: "Every person who shall aid, assist, abet, counsel, hire, command, or procure another to commit any crime or offence, shall be proceeded against as principal or as an accessory before the fact, according to the nature of the offence committed, and upon conviction shall suffer the like punishment as the principal offender is

subject to by this title." There seems to be no recognition on his part that in thus admitting these falsehoods in order to induce the plaintiff to violate the law and his oath of office, the reporter is at the same time impeaching the credibility of his own testimony in other respects and is thus defeating the very end he is seeking to accomplish. And he has only himself to blame if the jury disbelieved his entire story. It is but just to add that not only did the reporter go beyond the instructions given him, as above set forth, but that there is no evidence that his superiors ever authorized or instructed him to make any false representations of any kind. Indeed, a careful examination of the entire articles complained of fails to disclose therein, and as printed, any misrepresentation made by the reporter to the plaintiff, but makes it to appear that Cardarelli had "happened to get the impression" that the reporter was a gambler, but that the reporter did not say so, nor did he undeceive the plaintiff in this respect. Thus, the language in the article that "Cardarelli, who is known as Pete by all the inhabitants of North Providence *happened to get the impression* when he was talking to the newspaper man that his interviewer was a poker sharp who wanted to open up a gambling joint in Centredale" conveys no intimation that the reporter had falsely told Cardarelli, "That is my line, I am a poker man." Nor does it appear from the articles as published that the offers therein referred to of protection and of the erection of a building on land belonging to Cardarelli were not volunteered by Cardarelli, but were made in response to the admittedly false statements and questions of the reporter, p. 265, "I asked him if he knew of a place where I could start up such a game." . . . "He said he had a good place where we could run a Sunday game."
. . . "I asked him what kind of a place he could tell me about," etc. . . . "I told him I wouldn't want to come out there unless I would be assured that the police wouldn't raid us, and he told me that that place was right on his beat and that he would know beforehand if any raid was planned."

In the article it is stated, "When asked about the chances for opening a poker room, where some big players from Providence could get into a lively Sunday game without any possibility of interference, Cardarelli thought for a minute, and then said he knew of a plan that would just suit." In the reporter's testimony he said, p. 282, Q. 120: "I told him *I* had only big gamblers playing with *me* and there was no question at all about that." The defendant company has, however, admittedly published the articles in question and in justification it is forced to rely upon the testimony of a witness whom the jury evidently entirely discredited.

Again, the defendant's reporter testified as follows, on cross-examination (p. 290): "Now, Mr. Underhill, I wish to ask you whether this statement is correct. 'The reporter then went to Centredale to see if conditions had improved since last Sunday, when Constable Pietro Cardarelli watched the operations and told the reporter that such a condition was allowed because someone was getting his rakeoff. A. That appeared in what paper? Q. I don't care what paper. Is it correct? Objected to by Mr. Edwards. WITNESS: I can't fix the Sunday unless you tell me. THE COURT: Fix the date. Q. The 26th of April. A. That appeared in the 26th? Q. Yes. A. That was not correct. Q. That is not correct? A. It is not correct. Q. Then in so far as that libelous matter is contained the statement is false? A. It is not correct in so far as saying the conversation on the Sunday before took place in Centredale. Q. And in so far as saying that Cardarelli watched the operations in Centredale? A. It is incorrect in that detail also." (p. 295) "Q. 'The use of force to get in was a necessity for the room was packed solid with customers.' A. Literally solid. Q. 'These were jammed in solid tiers about the bar and the one bar-tender was dripping with sweat as he tried to fill the orders.' A. That is correct. Q. According to your testimony that occurred after you went into the Centredale hotel? A. That is correct and

in that essential that article is incorrect.   That article says I went to Seamans' first and to Centredale next but the article was written hurriedly and some way—   Q. And is the whole article incorrect the same way as the individual part?   THE COURT:   Don't break in on the witness.   Last answer repeated by stenographer.   WITNESS:   And in some way the time of going to the Seamans' saloon and the Centredale saloon was transposed.   The fact is that I went to the Centredale hotel first.   Q. But the facts as stated with the transposition of the names, the facts as stated are true, are they not?   A. Yes, they are.   Q. They are true?   A. No; don't transpose the names but transpose the time to which I went to the places.   I wouldn't say the facts relating to the Seamans' hotel as stated there relate to the Centredale hotel.   I don't infer that.   Simply that the time at which I went to the Centredale hotel is wrong there.   I went to the Centredale hotel first.   The conditions named in that article as having been found at the Centredale hotel are correct.   Q. They are correct?   A. They are correct.   Also the conditions relating to Seamans' saloon are correct." (p. 298)   "Q. Then this part of the article you put in here is imaginative?   A. It is not imaginative in any sense of the word.   It is not, perhaps, filled with what might be called legal evidence but from the newspaper standpoint it is very convincing evidence.   All the facts we needed for my article were there.   Q. And all the facts you needed for the whole article were there whether you saw it or not, weren't they?   A. As far as anything relating to Mr. Cardarelli is stated in that paper it is correct.   Q. And as far as relating to anything else it is incorrect?   A. Not necessarily.   I don't admit any gross errors.   There may be one or two inaccuracies due to writing the article hurriedly." (p. 299)   "Q. Now, you testified before the Town Council of the Town of North Providence on the 3rd day of last May, didn't you?   A. Yes, sir.   Q. Can you recall whether or not you swore to the truth of the whole of this article?   A. As I recall it, I swore to the truth of the whole article."

While there is much in the case for the plaintiff which is unsatisfactory, yet even if we consider the plaintiff's testimony to be untrue in every particular, as contended for by the defendant, the fact remains that upon the plea of justification the burden is upon the defendant. The plaintiff has made a *prima facie* case when he has shown that the articles are libelous and that they were published by the defendant. And these matters are admitted by the defendant, who seeks to avoid liability therefor by establishing their truth. Here the burden is upon it and not upon the plaintiff; and upon this issue, even if the evidence on behalf of the respective parties was equally balanced and equally discredited, the plaintiff must prevail for the reason that, contrary to the ordinary rule, that the burden of proof is upon the plaintiff, upon the pleadings in this case and upon the issue of the truth of the publication the defendant has failed to establish by a preponderance of the evidence the truth of the publication.

On the part of the defence the record of the sentence of the plaintiff to a term of six months in the Providence county jail on an indictment for breaking and entering and larceny to which the plaintiff pleaded "nolo contendere" was offered to affect the credibility of the plaintiff's testimony. The issue of credibility between the reporter thus admitting the falsehoods above referred to, as well as "one or two inaccuracies due to writing the article hurriedly" and such a plaintiff is peculiarly a question for the jury to determine and we leave that issue as we find the jury have determined it. It is proper to add that both parties offered evidence in corroboration of their respective claims.

The defendant's thirty-sixth exception was as follows: "At the conclusion of the charge of the presiding justice the defendant excepted to that portion of the charge to the jury which was as follows: 'If you decide that the plaintiff is entitled to a verdict and is entitled to punitive damages, in that case the amount which you will award is entirely within your discretion,' and asks that its exception duly taken at the time may now be allowed. Record p. 473.''

As modified by the subsequent instructions of the court (p. 474) that the plaintiff could in no event recover more than the *ad damnum* in the writ, we see no error in this instruction.

In *Kenyon* v. *Cameron*, 17 R. I. 122–125, the rule in this state was thus declared by Durfee, C. J., in an action for slander: "Awarding exemplary damages, in cases where they are allowable, is discretionary with the jury; and an instruction that informs the jury that it is their duty to award them, or, in other words, that the plaintiff is *entitled* to them is improper," citing cases. "The court fulfills its function when it instructs the jury whether the case is one that is proper for such damages, and brings to their mind the evidence of wilful malice or aggravation, if such there be, on which they are to exercise their discretion." And see *Vogel* v. *McAuliffe*, 18 R. I. 791, 796; *Hopkins* v. *Drowne*, 21 R. I. 20.

We cannot say that if the jury believed the plaintiff's contention, as indicated by the finding in his favor, that the verdict of $1,500 damages was excessive.

The defendant's thirty-eighth exception is as follows: "At the conclusion of the testimony, the defendant requested the court to charge as follows: 'Even though the article declared upon in the third and fourth counts is found by the jury to set forth a conversation alleged to have taken place on Sunday in Centredale the fact that such conversation did not take place in the place alleged will not permit the plaintiff to recover if the jury find that such alleged conversation took place on Douglas Avenue in Woodville.' The Court refused such request to the prejudice of the defendant's cause as appears on page 475 of the transcript of evidence filed herewith, hereby made a part of this bill of exceptions and marked 'Exhibit A,' and the defendant duly excepted to the rulings thereon and now asks that its exception duly taken at the time may now be allowed."

On page 471 of the transcript it appears that the trial justice sufficiently covered this point, as follows: "The

defendant has asked me to charge you specially,—'If you find that the plaintiff's conversation with Edward S. Underhill took place and was substantially as reported in these papers published by this defendant company then your verdict must be for the defendant.' I have already charged you substantially that. I charge you that now." This instruction must be held to mean that if this conversation between the defendant's reporter and the plaintiff occurred at all, then the verdict must be for the defendant.

The defendant's thirty-ninth request was as follows: "At the conclusion of the testimony, the defendant requested the court to charge as follows: 'If the jury find that the defence of truth is sustained by the evidence in the case then your verdict should be for the defendant even though you should find that such statements were printed from malicious motives.' The court refused such request to the prejudice of the defendant's cause as appears on page 475 of the transcript of evidence filed herewith, hereby made a part of this bill of exceptions, and marked 'Exhibit A.' and the defendant duly excepted to the rulings thereon and now asks that its exception duly taken at the time may now be allowed."

The trial court instructed the jury as follows: "As I have already stated here, that in order to entitle the defendant to a verdict on the ground that the publication of the matter is true, the truth of the matter that is published is substantiated by the evidence, it is necessary that the defendant should prove it is true by a fair preponderance of the evidence. In other words, the burden is upon the defendant to establish the truth of its article.

"The constitution of this State, article one, section twenty—reads as follows,—in regard to the press and the publication of libel or slander. 'The liberty of the press being essential to the security of freedom in a state, any person may publish his sentiments on any subject, being responsible for abuse of that liberty; and in all trials for libel, both civil and criminal, the truth, unless published for

malicious motives, shall be sufficient defence to the person charged.' So, gentlemen, you see under the law of this state, if the defendant has satisfied your minds by a fair preponderance of the evidence that the matters published in the article are true and that the publication was actuated by no malice but it was published in good faith, then your verdict should be for the defendant. If, however, it is true and it was published from a malicious motive, then you can see, under this provision of the constitution which I have just called your attention to, the truth would constitute no defence."

We are of the opinion that the charge of the court was a correct exposition of the constitution in this particular and that the above request to charge was properly refused.

We find no ground of reversible error in the remaining exceptions, nor can we see that the affidavits of newly discovered evidence in view of the counter affidavits on the part of the plaintiff are sufficient to warrant a new trial.

The defendant's exceptions are overruled and the cause is remitted to the Superior Court with direction to enter judgment on the verdict.

Sweetland, J., dissenting. I do not concur in the opinion of the court overruling the exceptions of the defendant. I am strongly of the opinion, from a review of the testimony and the affidavits of newly discovered evidence, that the verdict of the jury is an injustice to the defendant and that a new trial should be granted to it.

The verdict of the jury receives but scant support from the decision of the justice presiding, denying the defendant's motion for a new trial. After stating briefly the testimony given by the various witnesses, the justice concludes that the testimony is conflicting; that the jury found for the plaintiff; that he cannot say as a matter of law that the verdict is not warranted. The justice does not feel justified in setting the verdict aside, but from the language of his decision he does not give it hearty endorsement. According to the reasonable

interpretation of the rule laid down in *Wilcox* v. *Rhode Island Co.*, 29 R. I. 292, the decision of the justice of the Superior Court, granting or denying a motion for a new trial after verdict, will be given great persuasive force, but is by no means conclusive upon this court.

The alleged libels are statements of the substance of two interviews claimed by the defendant to have taken place in the town of North Providence, on the 17th and 18th days of April, 1909, between the plaintiff and Edward S. Underhill, a reporter in the employ of the defendant. The plaintiff denies that he had any such interviews with Mr. Underhill on said days or at any other time, or that he ever saw Mr. Underhill until May, 1909, when they both appeared at a hearing before the Town Council of North Providence.

In this state of the testimony, the important fact to be determined is whether the plaintiff and the said reporter were together and had interviews on these days. If it be established that there were conferences between them, then there is no reason to disbelieve the reporter as to what was said at the interview; for the plaintiff is discredited, and the only testimony that we have, as to the conversations, is that of Mr. Underhill as to April 17th and that of Mr. Underhill and his brother as to April 18th. The testimony fairly reviewed shows a preponderance in favor of the defendant upon that point. The reporter testified that the first meeting took place in Centredale in said town, on the beat of the plaintiff, in the evening of Saturday, April 17th, between eight and nine o'clock. The plaintiff denies absolutely that he met the reporter at that time and place. In support of his testimony the plaintiff produced that of his cousin and a number of other persons, who testified as to his whereabouts upon his beat on that evening. As to these witnesses it can be said that they were all friendly to the plaintiff and that their testimony has reference to the hour and minute of certain past occurrences in regard to which there is no reason for the witnesses to have retained an exact remembrance.

Opposed to this testimony is, first, the improbability of the invention of these interviews entirely from the imagination of the reporter. The defendant it appears had begun an investigation into the reported laxity of law enforcement in the town of North Providence, for the purpose of publication; and to further that plan had sent Mr. Underhill, who was at the head of one department of its force of reporters, to carry on that investigation. There appears to be no reason on the part of this defendant or its reporter for falsely attacking this plaintiff. He was an inconspicuous police officer of the village of Centredale, who was unknown to either the defendant or its employee before that time. At times, the public press, not perhaps without some appearance of reason, has been accused of using its great power unfairly, and, in the heat of controversy, of harshly and unreasonably reflecting upon the motives and the conduct of persons and of officers; but that a newspaper of standing or one of its intelligent and responsible servants should deliberately fabricate and publish a positive libel against a village policeman is highly improbable. There is no reasonable motive that can be ascribed to the reporter for such an act. He could not hope that these articles if untrue, which were not mere exaggerations or sly innuendoes, but defamation of the most direct kind, could bring advancement or reward to him, or could have any result but a lawsuit with the possibility of heavy damages against his employer and the loss of employment for himself. To avoid the publication of libel must be the constant concern of a newspaper office. A newspaper is at times obliged to rely for the data of its article upon the reports of persons outside its own force. Sometimes, perhaps led by the fear that it may fall behind its competitors, it publishes so-called news without taking time for investigation and verification. And so without intention on its part it is liable daily to offend, and to suffer the consequences in substantial damages paid in compromise or on verdict given against it. With this effect of a libel constantly before every one of that.

profession, it is quite unlikely that an intelligent reporter, connected with a responsible newspaper, will, without motive, hazard his livelihood and invent for publication a tissue of falsehoods containing not even a thread of truth. To be sure, this improbability will not outweigh positive testimony, but it should have weight in connection with positive testimony in the determination of this matter. Furthermore, as to the fact of the control by the plaintiff of a tract of woodland in North Providence, referred to in the alleged libelous publications, from the testimony it is unlikely that the reporter could have learned this, except from the plaintiff himself. The defendant has also produced positive testimony of apparently reliable and disinterested witnesses which strongly corroborates the testimony of Mr. Underhill. Mr. Underhill testified that he first met the plaintiff on the evening of April 17, when the plaintiff in company with another man was coming out of the drug store of John E. McKenna, in the village of Centredale; that he stopped the plaintiff and entered into conversation with him; that he walked along the plaintiff's beat with the plaintiff; that later they returned to the drug store together; and that he purchased cigars of Mr. McKenna and gave one to the plaintiff. In corroboration of that the defendant produced as a witness Ernest C. Simmons, who testified that he was in the drug store of John E. McKenna between eight and nine o'clock on the night in question with the plaintiff; that as they came out together the plaintiff was stopped by a stranger whom the witness did not know. John E. McKenna, the proprietor of the drug store, testified positively that the plaintiff came into the witness' store on the night in question in company with Mr. Underhill and that Mr. Underhill purchased of the witness a cigar for the plaintiff and one for himself. He also testified that the plaintiff had on two occasions endeavored to get him to say that it was the plaintiff's cousin who came in with the plaintiff on that evening and purchased the cigars, but Mr. McKenna was positive that it was Mr. Underhill. Mr.

Underhill also testified that the plaintiff gave to him the business card of the plaintiff's brother-in-law as an address where the plaintiff could be found; that Mr. Underhill wrote the name of the plaintiff upon the back, with a correction in spelling suggested by the plaintiff; that on the same evening Mr. Underhill also noted some memoranda of the conversation upon the back of the card.   This card was put in evidence and is before us with the endorsements testified to by the reporter appearing upon it.   Mr. Underhill also testified that he arranged with the plaintiff to meet him again at Centredale, on the plaintiff's beat, on Sunday, April 18th; that in accordance with that agreement on said April 18th, he went to Centredale with his brother, Walter B. Underhill; that they inquired of a newsdealer as to where the plaintiff was and afterwards they learned from a police officer that he had been that day transferred to the village of Woodville; that they went to Woodville and there saw the plaintiff and had the conversation with him, the substance of which appeared in one of the alleged libelous publications. To corroborate this the defendant produced the witness, William W. Whitehead, Jr., who keeps a news store in Centredale, who testified that the reporter and another man came to his store on April 18th and asked as to the whereabouts of the plaintiff; also Charles A. McCormick, a police officer, testified that the reporter in company with another young man asked him where the plaintiff was; that he told them that the plaintiff had been transferred that day to Woodville; and that the two young men left in the direction of Woodville.   The plaintiff brings in support of his denial of the interview with the reporter and his brother on April 18th, a number of witnesses who testify as to where the plaintiff was in Woodville during the afternoon of the 18th; but the same criticism may be made of this testimony as was made of the evidence offered to disprove the interview of April 17th.

The court in its opinion lays much too great stress upon the fact that the reporter resorted to artifice in dealing

with the plaintiff and that these interviews constituted propositions on the part of the reporter that both the plaintiff and himself should commit criminal offences, the plaintiff in leasing a building for the purpose of gaming, and the reporter in keeping a common nuisance. This extended consideration of that phase of the case seems to me to be wide of the mark. There is nothing in the case to indicate that the reporter really intended to hire a building from the plaintiff and open a gambling house. We are not concerned with the question whether in the circumstances of the case the use of dissimulation and misstatement was justifiable or morally defensible. Because of the nature of the plaintiff's testimony, the primary question here is,—did the alleged interviews take place, however improper or immoral the conduct of the reporter may have been? If we find that the reporter is blamable in using artifice, and in negotiating with the plaintiff to hire from him a building for the purpose of gaming, we thereby in effect find that the publications were true.

In considering the reporter's testimony we should of course bear in mind, as throwing some light upon his character for veracity, that he admits having made misstatements for the purpose of throwing the plaintiff off his guard. It must be remembered, however, that a vital part of the defendant's case is that the reporter did deceive the plaintiff. To say that it shall not be believed that the reporter deceived the plaintiff and that the interview happened because the reporter admits that he made misstatements for the purpose of deceiving him is indulging in a circular argument not entitled to quite the importance that the opinion of the majority of the court gives to it.

Since the verdict the defendant has filed the affidavits of three apparently disinterested persons whose testimony was unknown to the defendant at the time of the trial and was not discoverable by reasonable diligence on its part. These affiants state facts which if true show admissions on the part of the plaintiff that he did have the interviews with

Mr. Underhill as claimed by the defendant. With the evidence upon this vital issue so closely balanced, if not preponderating in favor of the defendant, I am of the opinion that if a new trial was granted and the testimony of these affiants introduced there is a strong probability that such testimony would change the result. It cannot strictly be called cumulative evidence, but if it were, the rule has been somewhat relaxed and if a new trial will tend to promote justice it may be granted, although the newly discovered evidence be cumulative in its nature. This has been recognized in *Hughes* v. *Rhode Island Company*, 27 R. I. 591.

From all these considerations I am of the opinion that a new trial should be granted.

MR. JUSTICE JOHNSON concurs in the dissenting opinion.

*Frank H. Wildes*, for plaintiff.

*Francis B. Keeney, Seeber Edwards, Edwards & Angell*, for defendant.